UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MARK GRIGGS, *et al.*,

                Plaintiffs,

                                              **REPORT AND**
                                              **RECOMMENDATION**
     - against –                               13 CV 3885 (KAM) (CLP)

STEVEN WEINER, *et al.*,

                Defendants.

------------------------------------------------------------X

**POLLAK**, United States Magistrate Judge:

     On July 12, 2013, plaintiffs Mark L. Griggs and John J. Ford commenced this action

against Steven Weiner[1] and Stuart Wertzberger, seeking a declaratory judgment and permanent

injunction to stop a pending arbitration. On September 30, 2020, plaintiffs filed a motion for

summary judgment, which was referred to the undersigned by the Honorable Kiyo A.

Matsumoto on April 1, 2021. Defendant Wertzberger, proceeding *pro se*, opposes the motion.

     For the reasons set forth below, the Court respectfully recommends that plaintiffs' motion

for summary judgment be granted.

---

[1] On November 13, 2018, the Court received notice advising of the death of Mr. Weiner.
(11/13/2018 Ltr., ECF 180).

1

## FACTUAL AND PROCEDURAL BACKGROUND

A. Summary Introduction

Plaintiff Mark L. Griggs ("Griggs") is a citizen of the State of Kansas and plaintiff John J. Ford ("Ford") is a citizen of the State of California. (Pls.' 56.1 Stmnt[2] ¶¶ 1, 2; Def.'s 56.1 CntrStmt[3] ¶¶ 1, 2). Defendant Stuart Wertzberger is a citizen of the State of Nevada. (Pls.' 56.1 Stmnt ¶ 3; Def.'s 56.1 CntrStmt ¶ 3). Steven Weiner, formerly a defendant in this case who passed away sometime in 2018, was a citizen of the State of New York. (Pls.' 56.1 Stmnt ¶ 4; Def.'s 56.1 CntrStmt ¶ 4).

The dispute in this case arises from a plan formulated by plaintiffs Griggs and Ford to invest in the development of casinos in Mexico. In connection with that plan, Ford formed three LLCs – the Markham Group LLC ("Markham"), Callide Partners LLC ("Callide"), and Canto Ventures LLC ("Canto") – that were to participate as shareholders in the Mexican corporate entities that were to actually operate the casinos. Defendant Wertzberger was to provide introductions to possible investors, in exchange for which he was given an opportunity to share in the profits generated by the casinos, subject to certain contingencies. Plaintiffs contend that before the casinos became profitable, the Mexican entities terminated their agreements with Callide and Canto in accordance with a provision in the agreements, and then failed to pay Callide and Canto amounts negotiated as part of a withdrawal and settlement agreement. Thus, plaintiffs contend that there were never any profits to share with Wertzberger and the contingencies that were a prerequisite to his receiving certain amounts under the Agreements never came to pass.

---

[2] Citations to "Pls.' 56.1 Stmnt" refer to plaintiffs' Statement of Material Uncontested Facts, ECF No. 210-2.

[3] Citations to "Def.'s 56.1 CntrStmt" refer to defendant Stuart Wertzberger's Rule 56.1 Counterstatement, ECF No. 218-13.

When Wertzberger was not paid the amounts he believed he was owed, he, along with Weiner and Howard Rubinsky, commenced an initial action in 2009 in the Eastern District of New York, seeking an award of finders' fees and claiming breach of contract. That case was dismissed by the court in 2010. Thereafter, a demand for arbitration was filed in California before the American Arbitration Association, based on an arbitration provision in the Callide and Canto Agreements. It is undisputed that neither Griggs nor Ford in his individual capacity are signatories to the Callide and Canto Agreements and hence they are not facially subject to the arbitration provision. Accordingly, Griggs and Ford brought the instant action to stay the California arbitration. Wertzberger contends that both Ford and Griggs are alter egos of Callide and Canto and that if the corporate veil is pierced, they would be subject to the arbitration provisions in the Callide and Canto Agreements. As demonstrated in greater detail below, although Wertzberger disputes many of the facts asserted by plaintiffs, he has failed to provide any evidence to support his theories for piercing the corporate veil. This Court therefore respectfully recommends that the motion for summary judgment, staying the California arbitration, be granted.

B. The Mexican Casino Venture

1) Callide and Canto

In 2006, plaintiffs Griggs and Ford began to investigate the possibility of building casinos in Mexico. (Pls.' 56.1 Stmnt ¶ 21; Def.'s 56.1 CntrStmt ¶ 21). Plaintiffs were introduced to defendant Wertzberger by Howard Rubinsky[4] because Wertzberger had contacts in the Mexican

---

[4] Mr. Rubinsky filed a motion to intervene on July 25, 2015, which was granted on January 29, 2016. (ECF No. 107). On July 31, 2020, the Court dismissed with prejudice Mr. Rubinsky's claims as an intervenor in this action. (ECF No. 207). (See discussion infra at 20-22).

gaming industry.[5]  (Pls.' 56.1 Stmnt ¶ 21; Def.'s 56.1 CntrStmt ¶ 21).[6]  Through Wertzberger's contacts, Griggs and Ford eventually met in Mexico with two Mexican attorneys – Martin Fuentes Telich ("Fuentes") and Oscar Paredes Arroyo ("Paredes") – who proposed obtaining a gaming license.[7]  (Pls.' 56.1 Stmnt ¶¶ 22-23; Def.'s 56.1 CntrStmt ¶¶ 22-23).

As a result of their meetings, Ford, an attorney, caused the formation of Markham, Callide, and Canto, all Delaware LLCs.  (Pls.' 56.1 Stmnt ¶¶ 8, 9, 13, 25; Def.'s 56.1 CntrStmt ¶ 25).  According to Ford's deposition testimony, Markham was formed to be the managing partner of Callide and Canto; Callide and Canto were formed to participate in the Mexican corporate entities that were to operate the casinos:  Camino A La Diversion S. De R.L. De C.V. ("Camino") and Segundo Round S. De R.L. De CV ("Segundo").  (Ford Dep.[8] at 36; see discussion infra at 9-13).

Plaintiffs assert that Ford negotiated and drafted the Callide Limited Liability Agreement ("Callide Agreement") and the Canto Limited Liability Agreement ("Canto Agreement"), and that he executed both agreements on behalf of Markham, as the sole manager of Callide and

---

[5] When asked at his deposition about his relationships with Rubinsky and Weiner, Wertzberger declined to answer any questions, stating that his business relationships were irrelevant or any agreement he may have had "is already included in all of the court documents and the testimony that I gave, and the paperwork is in the case already."  (Wertzberger Deposition Transcript, dated February 25, 2020 ("Wertzberger Dep.") at 14-16).

[6] Griggs testified at his deposition that prior to meeting with Wertzberger, Weiner came to Wichita and threatened Griggs' wife and children, claiming that Griggs owed money to Jay Kenney, Joe Pappa and Howard Rubinsky in connection with the development of a horse racing software venture. (Griggs Deposition Transcript, dated January 21, 2015 ("Griggs Dep.") at 25, 26-7).  After Griggs borrowed money from Ford to pay them off, Rubinsky approached Griggs regarding the prospect of installing gaming machines in Mexican casinos and introduced him to Wertzberger. (Id. at 35). Eventually, Wertzberger introduced Griggs and Ford to Ivy Ong, in connection with the acquisition of casino licenses in Mexico.  (Id. at 34-36, 41).

[7] Griggs testified that they were to obtain two licenses, each priced at $950,000, but Griggs denied sending any money to Mexico in connection with the acquisition of the licenses.  (Griggs Dep. at 57, 59).

[8] Citations to "Ford Dep." refer to the deposition transcript of John Ford, dated January 22, 2015 (ECF 210-12).

Canto.  (Pls.' 56.1 Stmnt ¶¶ 27, 28; see Ford Decl.[9] ¶¶ 6, 7 (stating that "[a]s Manager of Markham, I executed the Limited Liability Company Agreement with respect to Callide . . . [and] Canto" and that he did so "solely on behalf of and in my capacity as the Manager of Markham")).  Plaintiffs assert that the other parties to the Callide and Canto Agreements were Wertzberger and CFV, an entity formed and owned by Ivy Ong, Lawrence Kaplan, and Todd Kaplan.  (Id.)  According to Ford, "Griggs was never a member or manager of Markham, Callide Partners LLC or Canto Ventures LLC."  (Ford Decl. ¶ 19; Griggs Decl.,[10] Exs. B and C).

In response to these assertions relating to the genesis of the Callide and Canto Agreements, defendant Wertzberger contends that plaintiffs' statements are misleading.  (Def.'s 56.1 CntrStmt ¶¶ 27, 28).  Although defendant cannot say for certain that Ford negotiated the agreements, defendant believes that Ford drafted the Agreements and he agrees that he and CFV[11] were parties to the Callide and Canto Agreements.  (Id. ¶ 29).  Defendant also concedes that both he and Ford signed the Agreements, but defendant asserts that, based on emails and other evidence,[12] Ford executed the Agreements on behalf of himself, Markham, and Griggs.  (Id. ¶¶ 27, 28).  Defendant contends that Griggs and Ford received profits from the casinos,[13]

---

[9] Citations to "Ford Decl." refer to the Reply Declaration of John J. Ford, dated October 8, 2013 and submitted in connection with the plaintiffs' motion for preliminary injunction, ECF No. 210-14.

[10] Citations to "Griggs Decl." refer to the Reply Declaration of Mark L. Griggs, dated October 8, 2013 and submitted in connection with the plaintiffs' motion for preliminary injunction, ECF No. 210-19.

[11] Defendant also disputes that Larry Kaplan was an owner of CFV, asserting that it was Todd Kaplan.  (Id. ¶ 30).

[12] The Court notes Wertzberger's claim in this regard but he fails to cite any specific emails or evidence that actually support his supposition that Ford executed these Agreements on his own behalf or on behalf of Griggs.

[13] Again, although Wertzberger makes the claim that Ford and Griggs received monies from the casinos, he does not cite any specific evidence to support this claim, and both Ford and Griggs deny receiving any monies themselves from the casinos.  (See Griggs Dep. at 228, 249-51, 266-71, 280-84, 312-13; Ford Dep. at 146-52).

along with monies owed to Wertzberger, and that the corporate veil should be pierced to hold both Griggs and Ford bound by the Agreements as well.  (Id. ¶ 29; see Wertzberger Decl.[14] ¶ 5).

In his Declaration submitted in connection with the motion for preliminary injunction, Ford denied Wertzberger's claim that he received monies from Callide and Canto, asserting that "[b]ased upon the facts and circumstances . . .as confirmed by the documentary evidence produced in the prior E.D.N.Y. Action,[15] [he has] not received any payments, either directly or indirectly, from [Callide, Camino, Canto, or Segundo] with respect to the casinos contemplated [by those entities] in Mexico."  (Ford Decl. ¶ 26).  According to Ford, the LLCs (Callide and Canto) became shareholders in the Mexican entities that were involved in Camino and Segundo and that Markham invested indirectly in the Mexican entities through its membership in the LLCs.  (Ford Dep. at 42).

Wertzberger points to the minimal capitalization underlying the formation of Markham and the other LLCs as a basis for piercing the corporate veil.  In response to a question regarding Markham's capitalization, Ford explained in his deposition that "[i]t would have been nominal capital" because Markham was to be merely an investment entity, not an operating entity.  (Id. at 40; see also id. at 43 (stating that Markham was formed as "an investment entity.  It was never designed to be an operating entity").  Ford testified that he was the manager of Markham; that Markham had a bank account at Citibank, and as a member of the Callide and Canto LLCs, Markham indirectly invested in the Mexican entities, Camino and Segundo.  (Id. at 39).

---

[14] Citations to "Wertzberger Decl." refer to the Declaration of Stuart Wertzberger, dated September 13, 2013, and submitted in opposition to plaintiffs' motion for preliminary injunction, ECF No. 210-11, Ex. A.

[15] References to the "prior E.D.N.Y. Action" refer to an earlier case brought in this Court by Weiner against Griggs and Markham.  (See discussion infra at 17-18).

According to Ford's testimony, Callide and Canto, both limited liability corporations, were also investment entities; Callide's "sole purpose was to be a shareholder of Camino, and [its] members were to perform various services for Camino, but Callide in and of itself didn't conduct any operations.  It was an investment vehicle."  (Id. at 68, 75).  As with Markham, Ford testified that because "[i]t was not contemplated that Callide would contribute capital to Camino, [] there was no need for capital to contribute to Camino, so it would have been nominal capital contribution as reflected on Exhibit A."  (Id. at 75 (citing Callide Agreement showing that Markham's initial capital contribution was $130 and CFV's capital contribution was $30)).  Similarly, Ford testified that Canto's "sole purpose" was to become a shareholder in Segundo.  (Id. at 82).  According to the language of the Agreements themselves, the purpose of the corporate entity was to become a shareholder in such foreign companies as the Manager shall determine.  (Callide Agr.[16] ¶ 2.5; Canto Agr.[17] ¶ 2.5).  The Agreements further made it clear that Callide and Canto were not intended to be joint ventures, and that no Member would have any personal liability to the company or other Members.  (Id.)

According to the Agreements, the profit-sharing structure for Callide and Canto was divided into 16 units, with two initial Members -- Markham and CFV.  (Callide Agr., Ex. A; Canto Agr., Ex. A; Ford Decl. ¶ 10).  Markham initially held 13 of the 16 shares in each entity, with CFV holding the remaining three shares.  (Id.)  The Agreements provided that Wertzberger would become an additional Member after all shareholders in Camino and Canto received the return of their capital contributions and any outstanding loans were paid off.  (Callide Agr., Ex. A; Canto Agr., Ex. A; Ford Decl. ¶¶ 12, 13).  Upon the occurrence of that event, the shares

---

[16] Citations to "Callide Agr." refer to the Limited Liability Agreement with respect to Callide Partners LLC, attached as Ex. A to the Complaint.

[17] Citations to "Canto Agr." refer to the Limited Liability Agreement with respect to Canto Ventures LLC, attached as Ex. B to the Complaint.

would be redivided, with Markham holding five shares, CFV holding eight shares, and Wertzberger holding three shares.  (Callide Agr., Ex. A; Canto Agr., Ex. A; see Ford Dep. at 78). Once Camino and Segundo generated $100,000 in profits for a period of twelve months, the shares would be redistributed again, with Markham holding one share, CFV holding 12 shares, and Wertzberger holding three shares.  (Id.)  Thus, according to Ford, Wertzberger had "the potential, contingent opportunity to become a Member" of Callide and Canto, but the condition precedent was never satisfied since the shareholders of Camino and Segundo never received repayment of their capital contributions or repayment of their loans.  (Ford Decl. ¶ 13).

The parties dispute their respective involvement in Markham, Callide, and Canto. Plaintiffs assert that defendant Wertzberger invested no money in the casino project but Griggs and Ford expected him to introduce them to investors for the purpose of raising funds for the contemplated casino ventures.  (Pls.' 56.1 Stmnt ¶ 24).  Griggs testified that Wertzberger was to raise money to build the casinos.  (Griggs Dep. at 64).  Plaintiffs assert, however, that Wertzberger did not raise any money for the project.  (Pls.' 56.1 Stmnt ¶ 24).  When questioned at his deposition, Wertzberger conceded that other than giving $30 to Ford for his membership share in Callide and Canto, he did not contribute any money to open the casinos in Mexico. (Wertzberger Dep. at 23).   However, when asked what specific things he did to locate the casinos in Mexico, defendant Wertzberger declined to answer, responding instead that it "is all in the agreement, . . .I fulfilled my obligations and it's set forth in the Callide and Canto agreements. . . .[I]t's self-explanatory."  (Wertzberger Dep. at 18).  When asked if he was refusing to answer, Wertzberger again referred to documents filed with court and stated: "I am telling you that what I did was exactly what I was supposed to do, whatever that is . . . ."  (Id. at 19).

The parties also dispute Griggs' role in the ventures, with plaintiffs asserting that Griggs had no ownership interest or beneficial interest in Markham, Callide, and Canto. (Pls.' 56.1 Stmnt ¶ 26; Ford Decl. ¶ 19). Defendant Wertzberger disputes these statements, noting that Griggs' and Ford's ownership and beneficial interest in Markham, Callide, and Canto is "one of the central issues of the case." (Def.'s 56.1 CntrStmt ¶ 26). According to Wertzberger, there are numerous emails from Griggs in which he describes his ownership and beneficial interest in the casinos and during Griggs' deposition, he acknowledged his participation as Ford's "silent partner." (Id.) Wertzberger also takes issue with Griggs' explanation that he made these statements because he was afraid of Weiner, noting that he was making similar statements to his Mexican partners. (Id.)

2) Camino and Segundo

On or about May 3, 2007, Callide executed a shareholder's agreement with Camino, a Mexican corporation (the "Camino Agreement"). (Pls.' 56.1 Stmnt ¶ 32). On that same day, Canto executed a shareholder's agreement with Segundo, also a Mexican corporation (the "Segundo Agreement"). (Id. ¶ 33). Plaintiffs assert that Ford executed both the Camino Agreement and the Segundo Agreement on behalf of Markham, the sole Manager of Callide and Canto. (Id. ¶¶ 32, 33). Defendant Wertzberger disputes this assertion and insists that Ford executed the agreements on behalf of himself, Markham, Callide, Canto and Griggs. (Def.'s 56.1 CntrStmt ¶¶ 32, 33; Biancone Reply Decl.,[18] Exs. D, G).

Also party to the Camino and Segundo Agreements was All Steel Structures Limited ("All Steel"), a corporation organized and existing under the laws of the Isle of Man. (Pls.' 56.1 Stmnt ¶¶ 34, 35). Plaintiffs claim that All Steel was a client of Ford's but that neither Ford nor

---

[18] Citations to "Biancone Reply Decl." refer to the Reply Declaration of Louis Biancone, dated October 1, 2013, filed as Exhibit L to the plaintiffs' motion for summary judgment.

Griggs had any ownership or control over All Steel.  (Id. ¶ 35; Griggs Dep. at 70).  According to plaintiffs, Griggs suggested to Ford that he contact All Steel about investing in the Mexican casino projects which Griggs felt would be profitable for All Steel.  (Pls.' 56.1 Stmnt ¶ 36; Griggs Dep. at 70).  All Steel was to supply funds to obtain the licenses.  (Griggs Dep. at 70-72).  In exchange, All Steel would receive a one percent interest (1%) in Camino and Segundo and a return of 110% of all sums contributed in advance of certain distributions being made to other parties.  (Pls.' 56.1 Stmnt ¶ 37).  According to plaintiffs, All Steel provided several million dollars to Camino.[19]  (Id. ¶ 38).

Defendant claims not to know whether All Steel was a client of Ford's, and he complains that plaintiffs did not produce any documents regarding the ownership and control of All Steel, noting the confusion created by Griggs' emails and testimony and the absence of any documents regarding All Steel.  (Def.'s 56.1 CntrStmt ¶ 35).  Defendant does not dispute that All Steel is a party to both the Camino and Segundo Agreements but questions the amount of funds allegedly supplied or whether All Steel provided any funds at all, given that plaintiffs have provided no documentation to corroborate these assertions.[20]  (Id. ¶¶ 36, 37, 38).

3)  Callide and Canto Terminate Relationship with Camino and Segundo

According to plaintiffs, both the Camino and Segundo Agreements provided that Camino and Segundo had the right, "in compliance with a 'Regulatory Authority to terminate its relationship with any Shareholder or any of its subsidiaries, affiliates, directors, officer[s],

---

[19] Ford testified that All Steel also provided funds to Segundo, but it is unclear from the record before the Court how much money was provided.  (Ford Dep. at 116-17).

[20] If All Steel is truly an independent firm, then plaintiffs presumably would not have documents relating to its ownership or control.  Defendant's papers are silent as to whether he subpoenaed All Steel in this regard.  More to the point, as All Steel is not a party to the Canto and Callide Agreements that defendant seeks to enforce, it is unclear how All Steel's funding or lack thereof is material to the instant case.

shareholders or principals.'" (Pls.' 56.1 Stmnt ¶ 40 (quoting Camino Agr.; Segundo Agr.)). In

his Declaration submitted in connection with the preliminary injunction motion, Ford cited the

Financial Action Task Force on Money Laundering ("FATF") requirement that "[t]he identity of

beneficial owners of an interest i[n] a gaming facility is universally required," and since Mexico

is one of the member countries of the FATF, the parties were required to verify the identity of

the casino owners and operators. (Ford Decl. ¶ 39). Plaintiffs assert that following the execution

of the Callide, Canto, Camino and Segundo Agreements, Lawrence Kaplan, one of the three

individuals who had formed CFV, an initial member of Callide and Canto, pled guilty to

securities fraud. (Id. ¶ 42; see Ford Decl. ¶ 32, Ex. A). Ivy Ong, another member of CFV, also

allegedly has an extensive criminal record. (Pls.' 56.1 Stmnt ¶ 43). Since CFV held a 3/16 share

in each of Callide and Canto, Camino and Segundo elected to terminate their respective

relationships with Callide and Canto upon learning of Kaplan's and Ong's criminal activities, on

or about June 1, 2008. (Id. ¶ 44; Ford Decl. ¶¶ 33, 34, 35, 36).

Under the Camino and Segundo Agreements, if the right of termination was elected, then

Callide and/or Canto were to sell their ownership stake in Camino or Segundo back to the

respective entity. (Id. ¶ 45). Such a sale would be determined through an independent appraisal.

(Id.) According to plaintiffs, at the time Callide and Canto received notice of the election to

terminate, neither entity had the funds necessary to retain an appraiser. (Id. ¶ 46).

Plaintiffs assert that Ford, on behalf of Markham, negotiated the terms for the

withdrawal, and on June 1, 2008, Ford, in his capacity as a member of Markham, signed

Withdrawal and Settlement Agreements for both Callide and Canto. (Id. ¶¶ 47, 48). The

Withdrawal and Settlement Agreements provided that Camino and Segundo would pay Callide

and Canto the sum of $400,000 in four annual payments, beginning on June 1, 2008.  (Id. ¶ 49; Biancone Reply Aff., Exs. E and H).

Plaintiffs assert that neither Camino or Segundo honored their obligation to pay Callide and Canto pursuant to the Withdrawal and Settlement Agreements.  (Pls.' 56.1 Stmnt ¶ 51; Ford Decl. ¶ 41 (stating that Camino and Segundo "never funded [their] obligations" pursuant to the Withdrawal Agreements)).  Plaintiffs contend that neither Callide or Canto had the resources to enforce the agreements, and, as a result, neither received any monies from any of the Mexican casinos, nor were they able to participate in the ownership or operation of those casinos.  (Id. ¶¶ 52, 53).

According to plaintiffs, Griggs "felt personally and morally responsible for All Steel's losses" because he had persuaded All Steel to invest in the venture.  (Id. ¶ 54).  In correspondence, Griggs referred to All Steel's investments as his own even though Griggs claims he did not personally invest in the casino project and did not receive any monies from the casinos.  (Id. ¶ 55).  He undertook to persuade Fuentes and Paredes – the Mexican attorneys who proposed obtaining a gaming license -- to make full repayment to All Steel.  (Id. ¶ 54).  While All Steel received the return of some of its contributions to Camino,[21] plaintiffs claim that it was "nowhere near the several million dollars it contributed."  (Id. ¶ 56).

Defendant, in his Counterstatement, states that the associational issues which caused the withdrawal of Callide and Canto from Camino and Segundo "did not involve Wertzberger." (Def.'s 56.1 CntrStmt ¶ 40).  He claims that he never saw any documentation from a regulatory authority pursuant to which the termination occurred, and he asserts that the termination of the

---

[21] Griggs testified that although the Nogales casino opened and sent money to All Steel for a while, the money stopped at some point.  (Griggs Dep. at 139).  According to Ford, All Steel did not receive funds from Segundo.  (Ford Dep. at 137).

relationship between Camino and Callide and Canto and Segundo was "a ruse perpetrated by Griggs and Ford and their Mexican partners to cut me out of the transaction after they all had received the benefit of my introductions and contacts." (Id. ¶ 44). The bona fides of the parties in undertaking this action, he contends, is one for the trier of fact. (Id.)[22] He also contends that he is unaware of any justification for cutting him out of the Withdrawal and Settlement Agreements, asserting that the issue of whether he was properly cut out without receiving the agreed-upon compensation is an issue for the jury. (Id.)

Wertzberger contends that Griggs and Ford "misused the assets of Camino and Canto as part of their scheme to cut him out of the deal." (Id. ¶ 46). He further notes that Markham, Callide, and Canto were dissolved for failure to pay taxes. (Id. ¶ 47). Although he has no knowledge of the negotiations by Ford on behalf of Callide and Canto in the withdrawal process, Wertzberger did receive a proposal from Ford for a buy-out of his interest, but again, Wertzberger believes this was all part of the scheme to cut him out of the deal. (Id. ¶ 47). He disputes that Ford and Griggs acted in good faith in executing the Withdrawal Agreements. (Id. ¶ 49).

Ford disputes Wertzberger's contention that Griggs and Ford allowed Callide, Canto and Markham to be dissolved, explaining that because the entities were no longer transacting business and had no financial resources, "none of the entities filed annual state reports and their respective existences were apparently voided by the State of Delaware." (Ford Decl. ¶ 43; see also Kaley Aff.[23] Exs. A-B).

---

[22] Wertzberger also takes issue with plaintiffs' claim regarding the timing of Larry Kaplan's conviction, and their description of Mr. Ong's criminal record as "extensive." (Def.'s 56.1 CntrStmt ¶¶ 42, 43).

[23] Citations to "Kaley Aff." refer to the Affirmation of John H. Kaley dated September 13, 2013, filed as Exhibit H to the Wilinsky Declaration, ECF No. 210-12.

4) <u>Wertzberger's Claimed Amounts</u>

Wertzberger claims that under the Callide and Canto Agreements, he was owed certain payments which he did not receive.  The Callide Agreement provided that certain payments would be made to Wertzberger, including $25,000 upon execution of the Callide Agreement; $75,000 upon the opening of a gaming facility to be operated by Camino, and $200,000 received by Callide after all other shareholders in Camino and Segundo received repayments of sums loans or contributed. (Def.'s 56.1 CntrStmt ¶ 39; Callide Agr. ¶ 7.3(c)).[24]  Wertzberger adds that, as a "member,"[25] he also had a right to a 3/16[th] share in the profits of the casinos after the investors had recouped their investments.  (Def.'s 56.1 CntrStmt ¶ 31).

Plaintiffs assert that Callide tendered the required $25,000 to Wertzberger by wire transfer from Callide's Citibank account.[26]  (Pls' 56.1 Stmnt ¶ 39).  Wertzberger concedes that he received the $25,000 initial payment but did not receive the $75,000 he was owed upon the opening of the casino in Nogales, Mexico, nor did he receive the $200,000 payment which he was to be paid after investors recouped their investments.  (Def.'s 56.1 CntrStmt ¶ 39).  He also

---

[24] Defendant does not appear to assert that he is entitled to any monies under the Canto Agreement.  The Canto Agreement provided that defendant would receive $100,000 upon the grand opening of the casino operated by Segundo, and another $200,000 after all Camino and Segundo shareholders received repayment.  (Canto Agr. ¶ 7.3(c)).  Defendant has not disputed plaintiffs' claim that the Segundo casino never opened, and accordingly, that none of the conditions precedent contemplated by the Canto Agreement were satisfied.  (Pls.' 56.1 Stmnt ¶ 86(d); Def.'s 56.1 CntrStmt ¶ 86(d)).

[25] When questioned during his deposition about this reference to Wertzberger as a "member," Ford explained that according to the specific language of the Agreements, Wertzberger only became a "member" upon the happening of certain contingencies – namely, "all of the funds invested and loaned to Camino and Segundo were returned to people who provided capital and loans to Camino and Segundo." (Ford Dep. at 76).

[26] Plaintiffs note that defendants initially asserted that the monies had been wired from Ford's personal account until documentation was provided showing that the funds had in fact come from Callide's Citibank account.  (Pls.' 56.1 Stmnt ¶ 39).  Plaintiffs explain that this is important because Wertzberger had made these allegations under penalty of perjury only to later admit that he did not know which account the monies had come from.  (<u>Id.</u>)  In his responsive 56.1 Counterstatement, Wertzberger describes this as "an innocent error" and that Ford was "instrumental in making the wire happen."  (Def.'s 56.1 CntrStmt ¶ 39).

notes that he has never received any of the profits from the casinos, nor has he been given an accounting or information regarding the operation of the casinos.  (Id.)  He complains that there was never an "independent appraisal" of the value of his interest (id. ¶ 46), and that the notice of these Withdrawal and Settlement Agreements was only sent to him in September 2008, "just in time to try to cut Wertzberger out of the $75,000 payment he was entitled to when the casino in Nogales opened shortly thereafter in about September, 2008."  (Id.)  Wertzberger claims that, with statutory interest, he is entitled to upwards of $160,000 for that unpaid $75,000 amount, not including other amounts he did not receive to which he was entitled.  (Id.)

Defendant Wertzberger further disputes plaintiffs' assertion that neither Camino or Segundo honored their obligations, contending that Griggs' emails indicate that he received $400,000 in the form of an investment in other casinos and that there were adequate resources for Callide and Canto to take action to enforce the Agreements.  (Id. ¶¶ 51, 52).  Defendant further disputes the claim that Griggs never personally invested in the casino project, as shown by Griggs' emails, which Wertzberger contends present an issue for the trier of fact.  (Id. ¶ 55).  He also disputes Griggs' statement that he felt a moral obligation toward All Steel, noting that there were no records and Griggs' emails contradict this position.  (Id. ¶ 56).

5)  The Role of the Late Steven Weiner

The parties also dispute the role of the late Steven Weiner in the transactions.  Plaintiffs assert that Weiner was "a small-time crook," with a documented history of extortion and threats of violence.  (Pls.' 56.1 Stmnt ¶¶ 57, 58).  Plaintiffs claim that years before the formation of Callide, Canto, Segundo and Camino, Weiner attempted to extort money from Griggs, telling Griggs that he had been hired to collect a debt that had long been paid and threatening Griggs by telling him that he knew where Griggs family was located.  (Id. ¶¶ 57, 59, 60).  According to

15

plaintiffs, Weiner not only attempted to coerce Griggs into paying him additional monies, but he also insisted that Howard Rubinsky and Wertzberger include Weiner in the Callide and Canto projects and that they sign documents to transfer an interest in Callide to Weiner.  (Id. ¶¶ 60, 61).  Weiner is also alleged to have attempted to interfere with Ford's law license and the law license of plaintiffs' counsel in this action, sending counsel multiple threatening emails in an effort to extort some sort of settlement.  (Id. ¶¶ 62, 63; Wilinsky Decl.[27] ¶ 3, Ex. Q).  Weiner's own counsel in this lawsuit withdrew based on threats from Weiner, and Weiner allegedly "erupted" during a discovery conference before the Honorable Anne Y. Shields on November 30, 2017.  (Pls.' 56.1 Stmnt ¶¶ 65, 66 (citing Wilinsky Decl. ¶¶ 4, 11, 12, Ex. O; Kaley Decl.[28])).

This information about Weiner is relevant in that Griggs claims to have capitulated to Weiner's demands and threats, which caused Griggs to suffer depression and anxiety.  (Id. ¶¶ 67, 68).  Although Ford warned Griggs to ignore Weiner, Griggs not only gave Weiner money, but he also claims to have "personalized All Steel's investment and All Steel's right to repayment, offering various interests to Weiner in any sums received which were in excess of All Steel's right of recoupment."  (Id. ¶¶ 68, 69).

Defendant Wertzberger disputes plaintiffs' assertions about Weiner, including the claim that Weiner had a criminal record.  (Def.'s 56.1 CntrStmt ¶ 57).  Wertzberger also questions why, if Weiner's extortion efforts occurred prior to the formation of Callide, Canto, Camino and Segundo, Griggs would fly to Mexico and engage at all with Weiner and Wertzberger.  (Id.)  Wertzberger further notes that not only did Griggs fail to contact law enforcement about

---

[27] Citations to "Wilinsky Decl." refer to the Declaration of Thomas B. Wilinsky, Esq., plaintiffs' counsel, dated September 30, 2020, and attached to plaintiffs' motion for summary judgment, ECF No. 210-3.

[28] Citations to "Kaley Decl." refer to the Declaration of John F. Kaley, Esq., dated November 9, 2015, Ex. N to Wilinsky Decl.

Weiner's threats, but plaintiffs produced no records showing that Griggs sought help for his anxiety and depression. (Id.) Wertzberger also denies any knowledge of alleged wrongdoing on the part of Weiner and disputes plaintiffs' claims regarding threats to counsel. (Id. ¶¶ 58-66). As for monies loaned to Weiner by Griggs, defendant notes that there is no evidence of any loans and that all of the claims of threats and Griggs' resulting depression present issues of fact that require a determination of Griggs' credibility. (Id. ¶¶ 67-69).

C. The Initial Lawsuit

Prior to the commencement of the instant action, Weiner, Wertzberger, Rubinsky and CFV commenced an action in this Court on August 13, 2009, asserting claims against Griggs and Markham based on the Callide and Canto Agreements. (Weiner v. Markham Group LLC, No. 09 CV 3521; Pls.' 56.1 Stmnt ¶ 70). Griggs and Markham filed a motion to dismiss; while the motion was pending, Weiner and Rubinsky filed an Amended Complaint, removing Wertzberger and CFV from the action. (Weiner v. Markham Group LLC, No. 09 CV 3521; Pls.' 56.1 Stmnt ¶¶ 71, 72). In the Amended Complaint, Weiner and Rubinsky asserted a single claim of breach of contract, seeking finders' fees in connection with the casinos allegedly opened in Mexico. (Weiner v. Markham Group LLC, No. 09 CV 3521; Pls.' 56.1 Stmnt ¶ 72). Specifically, Weiner and Rubinsky alleged that in exchange for introducing investors to the defendants in that action – the Markham Group and Griggs – Weiner and Rubinsky were to receive 3% of half the profits earned by the casinos as a referral fee. (Mem. of Decision[29] at 1-2). In support of their claim, Weiner and Rubinsky relied on two emails from Griggs to Weiner which they claimed created an enforceable contract.

---

[29] Citations to "Mem. of Decision" refer to the Memorandum of Decision and Order of the Honorable Arthur D. Spatt in Dkt. No. 09 CV 3521, dated June 15, 2010.

On June 15, 2010, the Honorable Arthur D. Spatt dismissed the action, finding that the two emails did not contain all of the essential elements necessary to create a complete agreement, and that in the absence of a writing evidencing a valid contract, Weiner's and Rubinsky's claims were barred by the Statute of Frauds. (Id. at 6-7). Defendant Wertzberger does not dispute these facts as to the prior action, but argues that one of the bases underlying the motion to dismiss was Griggs' and Markham's claim that the case be sent to arbitration. (Defs.' 56.1 CntrStmt ¶¶ 70-73). However, a review of the record reveals that this argument was only made in the alternative and was not ultimately reached by Judge Spatt in his dismissal order. (Weiner v. Markham Group LLC, No. 09 CV 3521, Mot. to Dismiss, ECF No. 7, at 19-21; Mem. and Order, ECF No. 45).

### D. The Arbitration Proceeding

On December 12, 2012, the American Arbitration Association ("AAA") received a Demand for Arbitration submitted by Weiner against Ford (the "original demand for arbitration"). (Compl.[30] ¶ 2). This original demand for arbitration failed to specify the nature of the dispute or any facts supporting arbitrable claims, and failed to provide a written agreement between Weiner and Ford agreeing to arbitrate their disputes before the AAA. (Id.)

On December 21, 2012, after the AAA requested a copy of the contract providing for arbitration, Weiner filed the April 25, 2007 Callide and Canto Agreements, which he claimed formed the basis for the demand and he asked that Griggs be added as another respondent. (Id. ¶¶ 3-4). By letter dated April 22, 2013, the AAA concluded that Weiner had met the filing requirements for arbitration and deemed his December 21, 2012 submission to be an Amended Demand for Arbitration. (Id. ¶ 5).

---

[30] Citations to "Compl." refer to plaintiffs' Complaint in this action, No. 13 CV 3885, filed on July 12, 2013.

On June 10, 2013, Weiner submitted a letter to the AAA, alleging that Wertzberger had transferred a 1% interest in Callide and Canto to Weiner.  (Id. ¶ 18).  Based on this submission, the AAA deemed Weiner to be further amending his demand for arbitration to add Wertzberger as an additional claimant ("Second Amended Demand for Arbitration").  (Id. ¶ 19).

However, Griggs and Ford assert that they are not parties to either of the two operating agreements submitted to the AAA by Weiner and that they are not subject to arbitration before the AAA.  (Id. ¶ 6).  Plaintiffs also dispute that Wertzberger ever transferred a membership interest to Weiner or even had an ownership interest himself.  (Id.)  In plaintiffs' 56.1 Statement, they assert that the initial members of Callide and Canto were Markham and CFV.  (Pls.' 56.1 Stmnt ¶ 74 (citing Ex. A to Callide Agreement and Ex. A to Canto Agreement)).  Plaintiffs contend that the two Agreements expressly provided that Wertzberger would receive a 3/16th interest in Callide and Canto only when all shareholders in Camino and Segundo received the return of their capital contributions and loans.  (Id. ¶ 75).  Plaintiffs contend that despite the fact that none of these conditions precedent were satisfied because Callide and Canto withdrew from Camino and Segundo, respectively, Wertzberger claimed to own 3% of Callide, Canto, Camino, and Segundo. (Id. ¶¶ 76, 77).

Wertzberger disputes plaintiffs' claims, noting that the Callide and Canto Agreements refer to Wertzberger as a "member,"[31] and provided him with a 3/16 interest in the profits upon execution of the Agreements.  (Def.'s 56.1 CntrStmt ¶¶ 74, 75).  Wertzberger acknowledges that he could only monetize his interest after the investors received the capital contributions and loans were repaid.  (Id. ¶ 75).  However, he reiterates his position that there was no "forced

---

[31] See n. 25 supra.  Wertzberger also signed both agreements.  (Callide Agr. at 22; Canto Agr. at 22).

withdrawal" which prevented the conditions precedent from coming into play, except as part of a plan by plaintiffs to cut him out of the deal.  (Id. ¶ 76).

Plaintiffs further note that in the prior court proceeding, it was alleged by Wertzberger and Weiner that Wertzberger transferred 1.08% of his share to Weiner in 2008. (Pls.' 56.1 Stmnt ¶ 78; see Kaley Decl. ¶ 41, Exs. A, B).  According to plaintiffs, Wertzberger also claimed that he had transferred the remaining 2% interest in Callide and Canto to Rubinsky.  (Id. ¶¶ 79; Rubinsky Compl.,[32] Exs. 1, 2).  According to Rubinsky, one of the transfers took place on May 30, 2009 but was to remain secret until September 30, 2011.  (Id. ¶ 80; Rubinsky Compl., Ex. 1).  The other transfer to Rubinsky allegedly occurred on January 14, 2011.  (Id. ¶ 81; Rubinsky Compl., Ex. 1).  Plaintiffs note that the documents reflecting the transfers of all of Wertzberger's interests in Callide and Canto were signed by Wertzberger and contradict his statements made in his sworn Declaration submitted in support of his opposition to plaintiffs' preliminary injunction motion.  (Id. ¶ 82).

In response, Wertzberger concedes that he attempted to transfer his interests but that the Agreements required the consent of the remaining parties, and since no such consent was ever given, there was no transfer of any portion of Wertzberger's interest to Weiner.  (Def.'s 56.1 CntrStmt ¶ 78).  As for the transfer of a portion of his shares to Rubinsky, Wertzberger contends that not only was there no consent given under the Agreements, but Rubinsky failed to satisfy the conditions precedent to the transfers.  (Id. ¶¶ 79-82).

E. The Instant Action – Procedural History

Following the April 22, 2013 letter from the AAA, concluding that Weiner had met all of the filing requirements necessary to constitute a demand for arbitration, Griggs and Ford filed

---

[32] Citations to "Rubinsky Intervenor Compl." refer to the Intervenor Complaint filed by Howard Rubinsky on March 28, 2016.

their Complaint in the instant action seeking a declaratory judgment that they had no obligation to arbitrate Weiner's or Wertzberger's claims. They also sought to enjoin the arbitration proceedings on a number of grounds, including Griggs' assertion that he never received any of the demands for arbitration because the address provided by Weiner for service was incorrect. (Compl. ¶ 23). Plaintiffs also took the position that neither Weiner nor Wertzberger would be prejudiced if the arbitration was enjoined because neither Griggs nor Ford were parties to an agreement with either Weiner or Wertzberger to engage in arbitration. (Id. ¶ 26). They asserted that neither Griggs or Ford were parties to the Callide or Canto Agreements and that Wertzberger was not a party to the Agreements because the condition precedent to his admission as a member was never satisfied. (Id. ¶¶ 30, 32).

On July 12, 2013, plaintiffs filed a request for an Order to Show Cause, seeking a temporary restraining order and preliminary injunction, and requesting a stay of the arbitration pending a determination on the request for injunctive relief. (ECF No. 4). On November 22, 2013, the Honorable Joseph F. Bianco issued an Order granting plaintiffs' motion for a preliminary injunction and denying defendants' motion to dismiss for lack of venue. (ECF No. 28). Thereafter, discovery continued under the supervision of then Magistrate Judge Gary R. Brown until the case was reassigned to Magistrate Anne Y. Shields on May 6, 2015.

On July 25, 2015, Howard Rubinsky filed a Motion to Intervene in the instant action, which plaintiffs opposed. (ECF No. 71, 75). The district judge granted the motion on January 28, 2016. (ECF No. 107). While that motion was pending, counsel for defendants Weiner and Wertzberger sought to withdraw, which motion was also granted on February 24, 2016. (ECF Nos. 97, 111). From that point on, both defendants Weiner and Wertzberger proceeded to litigate this case *pro se*. (ECF No. 123). During this period, Rubinsky, who also was proceeding

21

*pro se,* filed crossclaims and counterclaims against Weiner, Wertzberger, Griggs, Ford and Markham, and discovery continued.  (ECF Nos. 119, 120).

On June 5, 2017, Judge Shields issued an Order compelling Rubinsky to respond to plaintiffs' request for documents and warning that sanctions may be imposed for failure to comply.  (ECF No.136).  When Rubinsky failed to comply, Judge Shields held a conference on November 30, 2017 to address plaintiffs' motion to preclude; Rubinsky failed to appear, "just as he failed to appear at the last conference before [Judge Shields] held on May 31, 2017."  (ECF No. 155).  On June 8, 2018, Rubinsky submitted a letter seeking to voluntarily withdraw from the action.  (ECF No. 163).  On October 11, 2018, Judge Bianco denied the request to withdraw pending a decision by the Magistrate Judge on certain outstanding discovery issues.  (ECF No. 177).  On November 13, 2018, the court received notice that Weiner had passed away.  (ECF No. 181).  Thereafter, on March 8, 2019, the case was reassigned to the Honorable Kiyo A. Matsumoto and the undersigned.

On April 9, 2019, this Court ordered Rubinsky to respond to plaintiffs' First Request for Production of Documents – reiterating Judge Shields' Order of June 5, 2017 and warning that an Order of preclusion would enter if he failed to comply.  (ECF No. 192).  On November 26, 2019, the Court granted plaintiffs' motion to preclude (ECF No. 198), and on July 10, 2020, this Court recommended that Rubinsky's claims be dismissed with prejudice.  (ECF No. 206).  On July 31, 2020, the district court adopted the Report and Recommendation and dismissed Rubinsky's intervenor complaint.  (ECF No. 207).

### F. Plaintiffs' Motion For Summary Judgment

The instant motion for summary judgment was filed by plaintiffs on September 30, 2020. Plaintiffs move for a declaratory judgment stating that plaintiffs are not bound to arbitrate

disputes relating to the various agreements described herein and asking that the court enter a permanent injunction to prevent the California arbitration, initiated by the late Mr. Weiner, from proceeding.  (Pls.' Mem.[33] at 2).  Citing to Judge Bianco's decision granting plaintiffs' motion for preliminary injunction, plaintiffs contend that defendant Wertzberger has failed to produce any "concrete evidence," despite extensive discovery, that would justify disregarding the corporate formalities to pierce the corporate veil and hold the individual plaintiffs liable for any injuries suffered by defendant in this case.

<u>DISCUSSION</u>

A.  <u>Standard For Summary Judgment</u>

It is well-settled that a party moving for summary judgment has the burden of establishing that no genuine issue of material fact is in dispute and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Thompson v. Gjivoje</u>, 896 F.2d 716, 720 (2d Cir. 1990).  Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, <u>see</u> <u>Egelston v. State Univ. Coll. at Geneseo</u>, 535 F.2d 752, 754 (2d Cir. 1976); <u>Gibralter v. City of New York</u>, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that "[s]ummary judgment is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it is quite clear what the truth is [and] that no genuine issue remains for trial."  <u>Auletta v. Tully</u>, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and citations omitted), <u>aff'd</u>, 732 F.2d 142 (2d Cir. 1984).  In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most

---

[33] Citations to "Pls.' Mem." refer to the Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, filed on September 30, 2020.  (ECF No. 210-1).

favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (stating that "[w]hen considering a motion for summary judgment the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party") (abrogated on other grounds by Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199 (2d Cir. 2006)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248 (internal citation omitted).

Federal Rule of Civil Procedure 56 provides that, in moving for summary judgment or responding to such a motion, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Rule 56's "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'"  Patterson v. County of Oneida, New York, 375 F.3d 206, 219 (2d Cir. 2004) (citing Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988)).  While the Court need consider only the materials cited by the parties, it may consider any other materials in the record in deciding a motion for summary judgment.  Fed. R. Civ. P. 56(c)(3).

B.  Notice to Pro Se Litigant

When the party opposing summary judgment is pro se, the Court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation and citation omitted). "[H]owever, a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  Thompson v. Tracy, No. 00 CV 8360, 2008 WL 190449, at *5 (S.D.N.Y. Jan. 17, 2008) (internal quotation marks and citation omitted).

Since a pro se litigant may not clearly understand the significance of a motion for summary judgment and may not be aware that he must file his own affidavits in order to preserve factual issues in controversy, both federal case law and Local Civil Rule 56.2 of the Eastern and Southern Districts of New York require that special care be taken to ensure that pro se litigants are made aware of such important procedural issues.  See Vital v. Interfaith Med. Ctr., 168 F.3d 615, 621 (2d Cir. 1999) (citing M.B. #11072-054 v. Reish, 119 F.3d 230, 232 (2d Cir. 1997) (per curiam)); see also McPherson v. Coombe, 174 F.3d at 281.

Here, plaintiffs' counsel failed to provide the requisite Notice to Pro Se Litigant Opposing Motion for Summary Judgment, required to be served pursuant to Civil Rule 56.2,

when he served his initial motion papers.  (Wilinsky Reply Decl.[34] ¶ 2).  According to plaintiffs' counsel, in the course of preparing reply papers on the motion for summary judgment, he realized his omission and immediately sent the Notice, along with copies of the Local Civil Rule and Fed. R. Civ. P. 56, to defendant Wertzberger in an email sent February 10, 2021.  (Id.)  The email explained the omission and offered the defendant the opportunity to submit further documentation.  (Id., Ex. A).  By that time, defendant had already filed an Affidavit/Declaration in Opposition to the Motion for Summary Judgment, along with exhibits, as well as a Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, and a Rule 56.1 Counterstatement.

On February 25, 2021, defendant Wertzberger submitted a Declaration, acknowledging receipt of the requisite Notice and indicating that he had filed the necessary exhibits showing that there were issues of fact that precluded entry of summary judgment.  (Wertzberger 2/25/2021 Decl.[35] ¶¶ 3-4).  The only additional information provided by the defendant was that he had failed to declare the statements made in his Rule 56.1 Counterstatement under oath, but that he was declaring that the statements were true to the best of his knowledge and belief.  (Id. ¶ 5).

Given that defendant has not only filed a Memorandum of Law, and Rule 56.1 Counterstatement, with supporting affidavits and exhibits, and has now been provided with the requisite Notice and time to supplement his papers, the Court is satisfied that defendant has a sufficient understanding of the nature of the proceedings and the consequences of summary judgment so that plaintiffs' motion may be considered.  See Vital v. Interfaith Med. Ctr., 168 F.3d at 621 (internal quotations omitted) (noting "The nature of the papers submitted by the [pro

---

[34] Citations to "Wilinsky Reply Decl." refer to the Reply Declaration of Thomas B. Wilinsky, Esq., dated March 4, 2021.  (ECF No. 223-2).

[35] Citations to "Wertzberger 2/25/2021 Decl." refer to the Declaration of Stuart Wertzberger, dated February 25, 2021. (ECF No. 222).

se] litigant and the assertions made therein as well as the litigant's participation in proceedings before the District Court," demonstrated the litigant's understanding of the proceedings).

C.  Subject Matter Jurisdiction

Although defendant does not challenge the existence of subject matter jurisdiction in this case, the Court has an "independent obligation to determine whether subject matter jurisdiction exists." Arbugh v. Y.H. Corp., 546 U.S. 500, 514 (2006).  In actions like this one seeking declaratory or injunctive relief, "the amount in controversy is measured by the value of the object of the litigation." Correspondent Servs. Corp. v. First Equities Corp. of Fla., 442 F.3d 767, 769 (2d Cir. 2006) (quoting Hunt v. Washington State Apple Advertising Com'n, 432 U.S. 333, 347 (1977).  Where damages are not requested, the Second Circuit measures this amount by "the value of the suit's intended benefit or the value of the right being protected or the injury being averted." Id.  There is a "rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc., 166 F.3d 59, 63 (2d Cir. 1999).

Here, plaintiffs seek injunctive and declaratory relief preventing the defendant from filing a petition to compel arbitration.  The plaintiffs claim that jurisdiction is proper under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.  (Compl. ¶ 12).  The Complaint alleges that plaintiff Ford is a citizen of California, plaintiff Griggs is a citizen of Kansas, and defendant Wertzberger is a citizen of Nevada.  (Id. ¶¶ 8, 9, 11).  The Complaint further alleges that defendant seeks to recover $5 to $15 million in arbitration.  (Id. ¶ 40). Accordingly, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

D. <u>Choice of Law</u>

Before addressing the merits of plaintiffs' motion, the Court must determine what law should be applied. In a diversity case, such as this, the choice of law rules of the forum state, in this case New York, generally apply. <u>See</u> <u>Krauss v. Manhattan Life Ins. Co.</u>, 643 F.2d 98, 100 (2d Cir. 1981). The parties have not addressed the issue of choice of law so the Court looks to New York law to determine what law to apply.

Under New York choice of law principles, courts generally apply the law of an LLC's state of registration to determine whether the corporate veil should be pierced. <u>See</u> <u>A.V.E.L.A., Inc. v. Estate of Marilyn Monroe ("A.V.E.L.A. II"), LLC</u>, 241 F. Supp. 3d 461, 474 (S.D.N.Y. 2017). In this case, both the Callide and Canto Agreements state that the companies were formed as Delaware Limited Liability Companies. (Callide Agr. ¶ 4.1; Canto Agr. ¶ 4.1). Therefore, Delaware law would presumably apply to determine whether Griggs and Ford were alter egos of Callide and Canto and can be held to the terms of the Agreements.

Instead, the parties have cited to New York law and relied on New York law to support their contentions. "[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." <u>Walter E. Heller Co. v. Video Innovations, Inc.</u>, 730 F.2d 50, 52 (2d Cir. 1984). "Under New York's choice-of-law rules, 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" <u>Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.</u>, 270 F. Supp. 3d 716, 724 (S.D.N.Y. 2017) (quoting <u>GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.</u>, 449 F.3d 377, 382 (2d Cir. 2006)). Delaware law on disregarding corporate form is virtually identical to that of New York. <u>See</u> <u>LaCourte v. JP Morgan Chase & Co.</u>, No. 12 CV9453, 2013 WL 4830935, at *6 (S.D.N.Y. Sept.

4, 2013) (holding that Delaware law regarding veil piercing is the same as New York law, referring to the Second Circuit's application in NetJets Aviation Inc. v. LHC Comm'ns LLC, 537 F.3d 168, 183 (2d Cir. 2008)).  Thus, in the absence of an actual conflict between Delaware and New York law, the Court will apply New York law.  See Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) (noting that, where no actual conflict of law is established, "if New York law is among the relevant choices, New York courts are free to apply it").

E.  Injunctive Relief

Plaintiffs move for a permanent injunction staying the arbitration proceedings commenced by Weiner before the AAA in California.

A party seeking a permanent injunction is ordinarily required to satisfy a four-factor test demonstrating:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-313 (1982)); see also Salinger v. Colting, 607 F.3d 68, 77 (2d Cir. 2010); UBS Secs. LLC v. Voegeli, 684 F. Supp. 2d 351 (S.D.N.Y. 2010) (holding that "'[t]o obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted'") (quoting Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006)).  "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." eBay Inc. v. MercExchange, L.L.C., 547 U.S. at 391.  The standard for granting a

29

permanent injunction is the same as that for a preliminary injunction, except that the moving party must demonstrate actual, rather than likely, success on the merits of its claim." United States v. Buddhu, No. 08 CV 0007, 2009 W 1346607, at *5 (D. Conn. May 12, 2008).

    1)  Irreparable Injury and Inadequate Remedies at Law

    Turning to the first two factors, plaintiffs contend that forcing them to arbitrate disputes with respect to which they did not agree in advance to arbitrate constitutes irreparable harm. (Pls.' Mem. at 12). In Steelworkers v. Warrior & Gulf Navigation Co., the Supreme Court held that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." 363 U.S. 574, 582 (1960); see also Howsam v. Dean Witter Reynolds, Inc. 537 U.S. 79 (2002). Whether the parties have agreed to submit a dispute to arbitration is "an issue for judicial determination," unless the parties have clearly indicated that the question of arbitrability should be decided by the arbitrator. AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649 (1986). While it can be inferred that the parties to an arbitration agreement intended certain issues of arbitrability, such as procedural questions, to be determined by the arbitrator, the gateway question presented here is a circumstance which the parties "would likely have expected a court to have decided." Howsam v. Dean Witter Reynolds, Inc. 537 U.S. 79 (2002). (See also Hearing Tr. 11/21/13[36] at 4 (holding that "[t]he issue here is the arbitrability of the Defendants' claims against the Plaintiffs, and that is obviously subject to judicial determination under the Howsam case) (citation omitted)).

    In Merrill Lynch Investment Managers v. Optibase, Ltd., the Second Circuit held that a party suffers irreparable harm if "forced to expend time and resources arbitrating an issue that is

---

[36] Citations to "Hearing Tr. 11/21/13" refer to the Transcript of Decision On Motions Before The Honorable Joseph F. Bianco, held November 21, 2013 (ECF No. 29).

not arbitrable, and for which any award would not be enforceable.  337 F.3d 125, 132 (2d Cir. 2003) (per curiam); see also UBS Securities LLC v. Voegeli, 684 F. Supp. 2d at 354.  Not only is there irreparable harm in the form of expenses and time that a party forced to arbitration would suffer, but the plaintiffs "would also lose [their] right to have defendant's claims adjudicated in a court of law, rather than in an arbitral forum to whose jurisdiction it has not consented."  UBS Securities LLC v. Voegeli, 684 F. Supp. 2d at 354.  See also Maryland Casualty Co. v. Realty Adv. Board, 107 F.3d 979, 985 (2d Cir. 1997).  The court in UBS Securities LLC v. Voegeli recognized that this loss of a right to pursue their claims in a court of law is an injury for which "there would be no adequate remedy at law." 684 F. Supp. 2d at 354.

In granting the preliminary injunction in this case, Judge Bianco held: "Plaintiffs have demonstrated irreparable harm," noting that "it is beyond dispute that irreparable harm would result if Plaintiffs were compelled to arbitrate Defendants' claims in a situation where they did not agree to arbitration and there is no other grounds for such arbitration."  (Hearing Tr. 11/21/13 at 3).  He further found that there was no adequate remedy if plaintiffs were forced to arbitration. (Id.)

Although defendant's *pro se* Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment contains a section entitled "Plaintiffs Have Not Demonstrated Irreparable Harm By Being Held to Their Agreement to Arbitrate," the arguments contained within the section are essentially arguments on the merits of whether plaintiffs should be compelled to arbitrate.  (Def.'s Mem. at 12-14).  Defendant does not address the precedents finding irreparable harm and an inadequate remedy at law when a party who did not agree to an arbitration is forced to arbitrate; he simply raises arguments as to why arbitration is required in this case.

31

Thus, in the absence of any change in circumstances since Judge Bianco's finding of irreparable harm in the context of the preliminary injunction,[37] this Court respectfully recommends that the district court find that that there is no material issue of fact as to whether plaintiffs have sufficiently demonstrated irreparable harm if forced to arbitration and no adequate remedy at law; thus, a permanent injunction is warranted if the other elements required for injunctive relief are satisfied.

    2)  Success on the Merits

As Judge Bianco noted, the issue in this case is whether the defendant's claim against the plaintiffs is subject to arbitration. (Hearing Tr. 11/21/13 at 4). The judge held that there is no dispute that "there is no express agreement to arbitrate." (Id.) Defendant concedes that Griggs did not sign either the Callide Agreement or the Canto Agreement. (Def.'s 56.1 CntrStmt ¶ 11). Moreover, there is no dispute that Ford signed the Agreements in his capacity as the representative for Markham, the Manager of both Callide and Canto, and not in his individual capacity. (Pls.' 56.1 Stmnt ¶ 13; Def.'s 56.1 CntrStmt ¶ 13). Thus, neither Griggs nor Ford are signatories to the Callide and Canto Agreements and therefore neither are subject to the arbitration provisions in the Agreements.[38]

---

[37] Plaintiffs argue that Judge Bianco's decision is law of the case. (Pls.' Reply Mem. at 10 (citing United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009)). However, given that his determination was made at the preliminary injunction stage and before full discovery, the Court disagrees that the law of the case doctrine compels this result, but concludes instead that given the absence of any additional information other than what was before Judge Bianco, his finding that plaintiffs will suffer irreparable harm if forced to arbitrate still holds true. See Alpha Cap. Anstalt v. Shiftpixy, Inc., 432 F. Supp. 3d 326, 339 n.13 (S.D.N.Y. 2020) (noting that "the Court is not bound by its conclusions at the preliminary injunction stage, particularly given that a preliminary injunction focuses on the interim time period before trial, and usually is determined on a less developed record.")

[38] By contrast, Wertzberger signed both Agreements in his individual capacity. See n. 25, 31, supra. Plaintiffs do not appear to challenge Wertzberger's standing to invoke the arbitration provision on the grounds that he was not a member of either Callide or Canto. See n. 25. They describe his interest in the Agreements as "contingent, but unvested." (Pl.'s Mem. at 6.) Since the arbitration provisions by their terms apply to "any dispute or controversy arising under or in connection with" the Agreements (Callide

Defendant Wertzberger contends, however, that plaintiffs should be subject to arbitration under the broad arbitration clauses of the Callide and Canto Agreements because plaintiffs are "nothing more than alter egos of the undercapitalized shell companies, which were created by them for the purpose of defrauding or committing a wrong against the Defendants." (Def.'s Mem. at 13). Citing Section 11.5 of both the Callide and Canto Agreements, defendant argues that the arbitration provision in each of the Agreements is "broadly written. . .encompassing any and all disputes arising under the agreements." (<u>Id.</u> at 12 (quoting Pls.' Compl., Ex. A at 20, and Ex. B at 20) (providing "any dispute or controversy arising under or in connection with this Agreement shall be resolved by confidential binding arbitration" conducted before a panel of three arbitrators in San Francisco, California, in accordance with the Rules of the AAA)).

Defendant relies on Second Circuit precedent that permits arbitration against non-signatories to the contract under the theory of veil-piercing/alter ego, <u>see, e.g.</u>, <u>Mag Portfolio Consultant v. Merlin Biomed Group</u>, 268 F.3d 58, 61 (2d Cir. 2001), arguing that in the instant case, the facts demonstrate that plaintiffs exercised complete dominion over the signatory to the agreements; the domination was used to commit a fraud or wrong; and as a result, defendant suffered a loss or injury. (Def.'s Mem. at 13 (citing <u>Freeman v. Complex Computing</u>, 119 F.3d 1044, 1052 (2d Cir. 1997))).

Defendant raised this same argument in opposing plaintiffs' motion for a preliminary injunction. In considering this argument, Judge Bianco noted that he did "not see any concrete evidence, rather than a theory" to justify piercing the corporate veil. (Hearing Tr. 11/21/13 at 8). Specifically, he noted that there was no evidence of inadequate capitalization, use of common space or that the corporations were treated as independent profit centers. (<u>Id.</u> at 7). He also

---

Agr. ¶ 11.5; Canto Agr. ¶ 11.5), the Court has not analyzed Wertzberger's standing with respect to the arbitration provisions.

found no evidence that plaintiffs dominated the corporations or used such domination to commit fraud.  (<u>Id.</u>)[39]  Judge Bianco identified three issues raised by defendants that warranted "limited discovery" before a permanent injunction could issue: 1) "this dispute about this $25,000" that defendants claim was drawn on Ford's personal account;[40] 2) an issue about monies from casino operations being distributed to Markham and Callide but not to Wertzberger; and 3) the email from Griggs discussing cash distributions used towards the projects.  (<u>Id.</u> at 8).

Thus, since the parties have now spent more than six years in discovery, the question before this Court is whether defendant has provided sufficient evidence to support his argument that plaintiffs were the alter egos of Callide and Canto such that the court should pierce the corporate veil and require plaintiffs to arbitrate Wertzberger's claims.

a)  <u>Corporate Veil Piercing – Alter Ego</u>

It is well established that absent a showing that there has been "control and domination" of a corporate entity that "was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act," New York will not allow the corporate veil to be pierced.  <u>Electronic Switching Indus., Inc. v. Faradyne Elec. Corp.</u>, 833 F.2d 418, 424 (2d Cir. 1987); <u>see also</u> <u>Itel Containers Int'l Corp. v. Atlantitrafik Exp. Serv. Ltd.</u>, 909 F.2d 698, 703 (2d Cir. 1990) (holding that under New York law, the corporate veil may be pierced "either when there is fraud or when the corporation has been used as an alter ego").  In <u>William Passalacqua Builders, Inc. v. Resnick</u>

---

[39] He did note that plaintiffs had proffered evidence that Wertzberger "was not entitled to any sums or membership interest beyond the $25,000 initial payment, until the occurrence of other events set forth in the operating agreements," and that plaintiffs had presented evidence that Callide, Canto and Griggs did not receive any monies from the casino ventures and the corporations had lapsed due to the absence of business.  (Hearing Tr. 11/21/13 at 7).

[40] This no longer appears to be an issue.  Ford provided documents demonstrating that the initial $25,000 came from the Callide Citibank business account, and not Ford's personal account.  (Pls.' 56.1 Stmnt ¶ 39).  Defendant conceded at his deposition that he had no knowledge which account the payment came from and has not presented contrary evidence to demonstrate plaintiffs' evidence to be false in this regard. (<u>Id.</u>; Wertzberger Dep. at 47).

<u>Development & Trade Services, Inc.</u>, the court set forth ten factors that courts should assess in determining whether to pierce the corporate veil:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

933 F.2d 131, 139 (2d Cir. 1991).[41]  The Court in <u>Passalacqua</u> conceded that applying these factors "is not an easy task because disregarding corporate separateness is a remedy that 'differs with the circumstances of each case,'" <u>id.</u> (quoting <u>American Protein Corp. v. AB Volvo</u>, 844 F.2d 56, 60 (2d Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988)), and noted that "[b]ecause New York courts disregard corporate form reluctantly, they do so only when the form has been used to achieve fraud, or when the corporation has been so dominated by an individual. . . that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." <u>Id.</u> (quoting <u>Gartner v. Snyder</u>, 607 F.2d 582, 586 (2d Cir. 1979)).

  b) <u>Wertzberger's Evidentiary Support</u>

   Defendant Wertzberger relies on a number of claims to argue that Canto and Callide were alter egos of Griggs and Ford.  First, he asserts that they were "undercapitalized shell companies;" that the Callide and Canto Agreements provided that all management and decision-

---

[41] Delaware looks to the same factors in determining whether to pierce the corporate veil.  <u>See</u> <u>In re Digital Music Antitrust Litig.</u>, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011) (listing commonalities between New York and Delaware veil-piercing law).

making power was to be exercised under the exclusive authority of the Manager [Markham] and that decisions of the Manager "shall be in its sole and unreviewable discretion." (Def.'s Mem. at 13 (quoting Pls.' Compl., Exs. A, B)). Since Ford has verified that he was the sole member and manager of Markham, and designated as the President of Callide and Canto, defendant argues that this is evidence that the plaintiffs dominated the entities. (Id. at 13-14 (citing Pls.' Ex. L; Biancone Decl., Ex. A; Pls.' Compl., Exs. A, B)). Defendant further argues that plaintiffs never produced any documents pertaining to the corporate formalities and finances of the various companies created by Ford, and that plaintiff Griggs never produced any documents showing his investment in the casinos, the $400,000 distribution he claims to have received, or the monthly reports of monies generated by the casinos. (Id. at 23).

Defendant also asserts that "Ford and Griggs utilized those companies to commit wrongs against Wertzberger and to deny him significant amounts of money to which he was entitled pursuant to their agreement. (Id. at 14). He argues that "[t]he record reflects it was all a sham from the start," and that after securing Wertzberger's contacts and firming up deals with the Mexican license holders, plaintiffs "allowed Markham, Callide and Canto to cease to exist." (Id. at 23). Finally, Wertzberger asserts that he has suffered harm because he never received the $75,000 that he was to be paid from Callide when the casino in Nogales opened. (Id. at 24). He further claims that he was entitled to receive potentially "many millions of dollars over the 25 years of the licenses." (Id.)

### i)  The Absence of Documentation

Turning first to the Passalacqua factors, Wertzberger contends that Callide and Canto were "undercapitalized shell companies," a claim raised before Judge Bianco in connection with the motion for preliminary injunction. However, Wertzberger has presented no evidence in

support of this assertion, nor has he provided any evidence demonstrating any of the other Passalacqua factors, such as absence of corporate formalities, corporate funds being used for personal reasons, common office space, or even that Ford and Griggs so dominated the corporate entities that they could be considered alter egos.  Wertzberger contends that despite asking for access to the books and records of Markham, Callide, and Canto, only a "few pages of documents" were produced. (Id. at 7).  He accuses Ford of failing to maintain financial records and asserts that "[n]ot a single piece of paper was produced from Callide or Canto (or Markham) accounting for any money into or out of the casino(s)" with a few exceptions.  (Id.)

With respect to the question of whether Callide and Canto were undercapitalized, Ford testified that they were designed to be investment entities, with the sole purpose of becoming shareholders in Camino and Segundo.  (Ford Dep. at 68).  They were never designed to be operating entities and thus had no need for large amounts of capital.  (Id.)  Indeed, it is not as if the capitalization of the entities was unknown to Wertzberger at the time the Agreements were executed; the amounts of capital provided by each of the signatories to the Callide and Canto Agreements were set out explicitly in the Agreements themselves.  (Callide Agr,. Ex. A; Canto Agr., Ex. A).

Wertzberger complains that corporate funds were used for the personal benefit of Ford and Griggs, and that corporate formalities were not observed.  Again, Wertzberger has not cited to a single piece of evidence to support that contention.  He argued before Judge Bianco that the $25,000 amount that he was paid came from Ford's personal account, suggesting an improper commingling of funds, but the evidence is clear that Callide had a bank account at Citibank and, in fact, the check for $25,000 originated from that account.  (Ford Dep. at 69).  Confronted with that evidence, Wertzberger simply claimed not to know where the money came from.

(Wertzberger Dep. at 47). Thus, Wertzberger has not shown through any evidence, other than his own speculation, that there was an improper commingling of corporate and personal funds.

Indeed, apart from the capitalization of Callide and Canto, which was known to Wertzberger and which has been explained by their purpose as investment entities, Wertzberger has failed to provide evidence of any of the factors listed in Passalacqua that would demonstrate that plaintiffs were alter egos of Callide and Canto.

Wertzberger also complains that plaintiffs have failed to produce documents relating to Callide and Canto. However, in their Reply Memorandum, plaintiffs note that "defendants were afforded years to conduct abundant discovery" in this action and in the prior action before Judge Spatt. (See Pls.' Reply at 7; Wilinsky Reply Decl. ¶¶ 4-7). In the prior action, plaintiffs produced over 2,300 pages of relevant discoverable documents in their possession to defendant's counsel (Biancone Reply Decl. ¶ 26), along with answers to interrogatories, and both Ford and Griggs were subjected to hours of deposition. (Pls.' Reply at 7). The docket sheet reflects that during the time defendants were represented by counsel in the instant action, counsel filed numerous discovery motions that were resolved by the then-assigned Magistrate Judges,[42] and plaintiffs filed Declarations indicating that they had produced all discovery in compliance with the demands and court orders. (Id. at 7-8).

In an effort to disprove Wertzberger's unsupported accusations that plaintiffs invested large amounts of money in the casino ventures and received payments that should have been shared with Wertzberger, plaintiffs produced redacted versions of their tax returns to demonstrate that plaintiffs had not received any income from the casinos, as alleged by defendant. (Wilinsky Reply Decl. ¶ 5). Not satisfied with the tax returns provided by plaintiffs,

---

[42] Indeed, the parties appealed two discovery rulings to the district judge, both of which were affirmed. (ECF Nos. 49, 131).

defendant's former counsel obtained an Order from the court, dated October 9, 2015, requiring plaintiffs to provide the names of their tax preparers.  (Id. ¶ 6).  Although plaintiffs provided that information in compliance with the Order, plaintiffs' counsel notes that neither defendants' counsel nor Wertzberger, when appearing *pro se*, ever sought further discovery from the tax preparer.  (Id. ¶ 8).  Indeed, as counsel notes, Wertzberger, proceeding in his *pro se* capacity, failed to appear at three discovery conferences held before Judge Shields and never sought any further discovery from plaintiffs.[43]

Given the extensive discovery that was conducted in this case and in the initial matter before Judge Spatt, defendants were afforded every opportunity to pursue discovery, and the numerous discovery disputes that were brought before the assigned Magistrate Judges demonstrate that defendants were aware of their recourse in the event they felt their requests had not been adequately responded to.  Wertzberger, in essence, waived his right to complain about the lack of certain documentation when he failed to appear at three conferences before Judge Shields where such issues could have been raised.  As a consequence, Wertzberger cannot now rely on the absence of documentation alone to oppose plaintiffs' motion for summary judgment.

ii)    The Griggs Emails

Wertzberger relies heavily on a series of emails sent between May 22, 2008 and March 2, 2009, that he contends demonstrate Griggs' ownership interest in the Mexican casinos that were part of the underlying agreements that Wertzberger claims existed between him and plaintiffs. (Def.'s Mem. at 15-18).  The first email he cites, dated May 22, 2008, was from Griggs to

---

[43] An issue was raised before Judge Shields regarding plaintiffs' failure to provide a privilege log. (Tr. 5/3/18 at 21-23).  At a hearing held on May 5, 2018, plaintiffs' counsel made it clear that plaintiffs had produced all relevant documents and there was nothing being withheld on the grounds of privilege, making a privilege log unnecessary. (Wilinsky Reply Decl.  9).  Indeed, Judge Shields expressly ruled: "So there's no privilege log.  It's not even an issue."  (Tr. 5/3/18 at 23).

Weiner, in which Griggs states that he "partnered with a group of attorneys in Mexico that have secured over 18 federal gaming licenses" and that "[w]e are looking for an investor partner that would like to come in and help us move the project faster." (Wertzberger Decl., Ex. 3). Among the six casino projects listed in the email, defendant argues that Nogales actually opened "around September 2008, . . .just weeks after the so-called forced withdrawal of Callide and Canto from the Camino and Segundo Agreements." (Def.'s Mem. at 16 (citing Pls.' Ex. L; Bianco Decl., Ex. E)). In a subsequent email sent between October 3 and October 9, 2008, Griggs provided Weiner with an update on Nogales, noting that the casino "opened a week ago today" and that the numbers were "good. . .not great," averaging about "50% of what we projected it would be." (Id. (quoting Wertzberger Decl., Ex. 3)).

Another email cited by Wertzberger is a November 10, 2008 email to Weiner in which Griggs referenced "[o]ur agreement in Nogales," and stated: "I have agreed to pay Howie Corp[44] 3% of the profits of my 5%. . . after investment is recouped by me." (Def.'s Mem. at 16 (quoting Wertzberger Decl., Ex. 3)). In a subsequent email, Griggs told Weiner:

> Ok. Let me be as Crystal clear as you have been. . . . I have kept EVERY promise I have made. . . . you currently own 3% of my 50% of the casino in Mexico. I cannot control what my attorneys do and don't do. . . .I have promised the 3% of both casinos. . .and we have agreed that you will get that check every month. . . .after the investment has been paid back. . . . currently one casino is open. . .and the investment is 3.1 million. Currently the casino has made a little over 220K in profit for our group. . .about 100K each month.

(Def.'s Mem. at 16 (quoting Wertzberger Decl., Ex. 3)).

On March 2, 2009, Griggs wrote to Weiner a lengthy email, in which he claimed to "'currently' own 50%" of Nogales. (Id. at 17 (quoting Wertzberger Decl., Ex. 3)). In the email,

---

[44] Howie Corp. apparently refers to Stuart Wertzberger and Howard Rubinsky's alleged joint interest in the Callide Agreement. (Griggs Dep. at 204-05).

Griggs indicates that he is currently invested in Nogales for $2.3 million in construction expenses and $950,000 for the license.  (Id.)  He also discusses being offered shares in other casinos and he tells Weiner: "Steve, at this time I am completely out of money. . . .So what I have is this, if the Mexican partners agree.  50% of Nogales[,] 25% of Mexico City[, and]  25% of Cancun."  (Id.)  He then offers 10% of Nogales and 2.5% each of the casinos in Mexico City and Cancun, along with a full 10% of a location on which to build another casino.  (Id. at 18).  Defendant further cites a series of emails sent by Griggs to the Mexican partners in the venture, again referencing monies he invested in the various casinos.  (Def.'s Mem. at 19-20 (quoting Wertzberger Decl., Ex. 4).

In his deposition, Wertzberger explained his theory that these emails demonstrated that Griggs was the alter ego in the transaction, that he "had [an] undisclosed interest in these casinos, and it is apparent to me, that is why I believe I can pierce the corporate veil and hold them personally accountable."  (Wertzberger Dep. at 88-89).  In opposing the motion for summary judgment, Wertzberger argues that Griggs' "first-person" reference to his ownership and investments in Nogales and other casinos belies his denial that he invested any money in the casino projects.  (Def.'s Mem. at 20-21).  He contends that Griggs' credibility raises material issues of fact that require consideration by a trier of fact.  (Id.)

Griggs, in response to Wertzberger's argument, testified that because he had been instrumental in convincing an outside investor, All Steel, to invest in the casino project, Griggs felt "morally obligated to obtain repayment for All Steel," and used the first-person reference in referring to All Steel's investment. (Pls.' 56.1 Stmnt ¶¶ 54-55; Griggs Dep. at 87-88).  Indeed, both Griggs and Ford testified that after Callide withdrew from Camino, Griggs persuaded Camino to send some money to All Steel in partial repayment of its investment.  (Pls.' 56.1

Stmnt ¶¶ 54-56; Griggs Dep. at 86-88, 137-39, 276-77; Ford Dep. at 155). Plaintiffs note that Wertzberger has provided no evidence to contradict All Steel's investment in the projects or to challenge Griggs' explanation in this regard.[45]

Griggs further explained that the emails he sent to Weiner were sent in an effort to dissuade Weiner from further threatening him and his family in an effort to extort monies from Griggs. (Pls.' Mem. at 14-15).[46] Wertzberger questions Griggs' credibility in this regard, not conceding that Weiner had a record of extortion, and questioning why Griggs produced no medical records to corroborate his claim that Weiner's threats caused him such a state of distress that he was forced to seek medical help. (Def.'s Mem. at 20-21). Wertzberger further contends that even if Griggs is to be believed, it does not explain why Griggs made such statements to the Mexican partners. (Id. at 21).

Apart from questioning Griggs' explanation for emails in which Griggs claimed to have an investment interest in the casinos, Wertzberger has not presented any evidence that would warrant disregarding the corporate forms of Callide and Canto. Even if Griggs had a personal investment in the Mexican casinos and was not sending these emails to Weiner to ward off his threats or to pursue recovery of an investment made by All Steel, these emails alone are not

---

[45] During his deposition, Wertzberger was asked if he had any evidence to contradict Griggs' sworn testimony that he was referring to All Steel's investment and not to himself in these emails. (Wertzberger Dep. at 134-135). Wertzberger responded: "No. I was actually surprised that he would say what he said. . . .No, I have no evidence." (Id.)

[46] In an effort to corroborate their claim, plaintiffs cite Weiner's "lengthy record of extortion," relying specifically on claims filed in the District Court in the Middle District of Florida in a case denominated Smallwood v. Weiner, where the plaintiff claimed that Weiner threatened the plaintiff if he did not pay Weiner $40,000, Weiner would kill or maim plaintiff's horse Val's Prince. (Ex. M to Wilinsky Decl.). As a consequence, Smallwood was forced to convey Val's Prince to Weiner. (Id.) Although plaintiffs have supplied the Court with Smallwood's Emergency, Ex Parte Motion for Appointment of a Receiver, dated August 17, 1999, the only further information provided was a news article from BloodHorse.com Horse Racing News, which indicated that the judge in that matter had found full ownership of the horse to be vested in Weiner's co-defendant Martin, leaving it unclear whether Weiner was in fact found liable for the claims of extortion raised by the plaintiff, Smallwood, who was reputedly a convicted felon.

42

enough to justify a finding that Callide and Canto were alter egos of Griggs. Instead, it appears that there was no reason for Wertzberger to receive his $75,000 because Callide withdrew from Camino before the Nogales casino ever opened.

"The law permits the incorporation of a business for the very purpose of enabling its proprietors to escape personal liability." Walkovszky v. Carlton, 18 N.Y.2d 414, 417, 223 N.E.2d 6, 7, 276 N.Y.S. 2d 585, 587 (1966). While incorporation "does not exempt the individuals from liability for an enterprise which they themselves choose to carry on as individuals independently of the corporation," African Metals Corp. v. Bullova, 288 N.Y. 78, 41 N.E.2d 466 (1942), corporations "are legal entities distinct from their managers and shareholders and have an independent legal existence." Port Chester Elec. v. Atlas, 40 N.Y.2d 652, 357 N.E.2d 983, 389 N.Y.S.2d 327 (1976). It is for this reason that New York courts have held that "[o]rdinarily, their separate personalities cannot be disregarded," id. (citing Rapid Tr. Subway Constr. Co. v. City of New York, 259 N.Y. 472, 487-488, 182 N.E. 145, 150 (1932), and courts only "have the authority to look beyond the corporate form where necessary 'to prevent fraud or to achieve equity.'" Id. (quoting International Aircraft Trading Co. v. Manufacturers Trust Co., 297 N.Y. 285, 292, 79 N.E.2d 249, 252 (1948). The factors outlined in Passalacqua are among the indicia of corporate identity that courts look to in order to determine whether "the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends." Walkovszky v. Carlton, 18 N.Y.2d at 418, 223 N.E.2d at 8, 276 N.Y.S. 2d at 588.

Here, defendant has not presented any evidence to suggest that the external indicia of separate corporate identity was not maintained. The emails cited by defendant do not reference Callide or Canto, nor do they suggest that the corporate entities were engaged in the personal

43

business of Griggs.  In NetJets Aviation, Inc. v. LHC Comm'ns, LLC, 537 F.3d 168, 182 (2d Cir. 2008), the Second Circuit, applying Delaware law, found that veil piercing was appropriate where the individual "completely dominated [a corporate entity] and that he essentially treated [the entity's] bank account as one of his pockets, into which he reached when he needed or desired funds for his personal use."  Wertzberger has not presented any evidence whatsoever to suggest that Griggs was treating the bank accounts of Callide and Canto as his own for personal use.  Assuming the facts as alleged by Wertzberger, the emails simply suggest that Griggs was an investor who had an interest in the Mexican casinos.  Even if Griggs did have an interest in the casinos, an investor's interest in a corporation or its projects would not alone justify piercing the corporate veil.  See Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc., 952 F. Supp. 2d 542, 578 (S.D.N.Y. 2013) (stating, "the mere fact that an individual is the sole member, shareholder, or a controlling person in an entity does not, by itself, justify piercing the corporate veil").  In the absence of any other evidence that Griggs dominated Callide and Canto or disregarded the corporate form to commit a fraud or other wrongdoing, the Court finds that Wertzberger has failed to raise sufficient facts to warrant a trial on his alter ego theory.

Moreover, Wertzberger has provided no evidence to suggest that Ford had any monetary stake in the two entities or that he operated in any capacity other than as a representative and President of Markham, the manager of Callide and Canto.  In Freeman v. Complex Computing Co., the Second Circuit found that an individual "was appropriately viewed as [an entity's] equitable owner for veil-piercing purposes" where the individual "'exercised considerable authority over [the corporation] . . . to the point of completely disregarding the corporate form and acting as though [its] assets were his alone to manage and distribute.'"  119 F.3d 1044, 1051 (2d Cir. 1997) (quoting Lally v. Catskill Airways, Inc., 198 A.D.2d 643, 603 N.Y.S.2d 619, 621

(3d Dep't 1993)).  As with his claims about Griggs' role in Callide and Canto, Wertzberger has

not presented any evidence to show that Ford took any actions to disregard the corporate form or

to use assets of Callide and Canto, of which there were none, for his own benefit.  Instead, when

asked why Markham's corporate veil should be pierced to hold Ford responsible, Wertzberger's

only response was that: "He violated the agreement. . . .He defrauded me."  (Wertzberger Dep. at

85).

> c)  No Evidence of Fraud

Even if defendant's evidence was sufficient to demonstrate that Ford and Griggs

exercised complete domination and control over Callide and Canto, there is no evidence that they

used this control "to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust

act."  Electronic Switching Indus., Inc. v. Faradyne Elec. Corp., 833 F.2d at 424.  "To state a

claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or

omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with

the intent to defraud; and (4) upon which the plaintiff reasonably relied; and (5) which caused

injury to the plaintiff."  Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395,

402 (2d Cir. 2015).

As noted supra, defendant conflates the alleged breach of an agreement with fraud.

(Wertzberger Dep. at 85).  In his Counterstatement of Material Facts, he asserts:

> Callide has not complied with all of its obligations to
> Wertzberger.  While Wertzberger did receive the initial
> Payment of $25,000, he did not receive the $75,000 he
> was due upon the opening of the casino in Nogales.

(Def.'s 56.1 CntrStmt ¶ 39).  At his deposition, he similarly explained his claim as a breach of

contract:

> It was a contract that was executed by Ford on behalf of

> Markham.  John [Ford] wrote it and the remedy is binding
> arbitration. . . .They breached the contract by not paying
> me when Nogales opened.

(Wertzberger Dep. at 33, 80).  He does not describe any damages from the alleged misuse of

corporate forms, nor does he contend that he was fraudulently induced to invest in the project;

his claimed damages are the sums he claims he was owed under the Callide and Canto

Agreements.  In the Demand for Arbitration, the claim is identified as "business contract."

(Kaley Aff., Ex. I).

In Mirage Entertainment v. FEG Entretenimientos S.A., the court held that an alleged

breach of contract by a corporate entity cannot form the basis for piercing the corporate veil.  326

F. Supp. 3d 26, 35 (S.D.N.Y. 2018); see also Highland CDO Opportunity Master Fund, L.P. v.

Citibank, N.A., 280 F. Supp. 3d 716, 732 (S.D.N.Y. 2017).  In NetJets Aviation, Inc. v. LHC

Communications, LLC, 537 F.3d at 183, the court held that in the context of a considering

corporate veil-piercing, the alleged fraud "must consist of more than merely the tort or breach of

contract that is the basis of the plaintiff's lawsuit."  See also LaCourte v. JP Morgan Chase &

Co., 2013 WL 4830935, at *6.

In this case, defendant has not cited any other alleged injury apart from his claim that

under the Callide Agreement, he was entitled to received $75,000 upon the opening of the

Nogales casino and that he never received such payment.  (Def.'s Mem. at 5).  Since the Callide

Agreement with Camino, under which he claims he was entitled to receive the $75,000, had been

terminated prior to the opening of the Nogales casino, his breach of contract claim fails in any

event.  In addition, he claims that he was entitled to and never received other payments based on

a formula set out in the Callide and Canto Agreements, which he claims "could total many

millions of dollars over the 25 years of the licenses."  (Id. at 6).  These are claims that Callide

and Canto breached their agreements with Wertzberger, but do not rise to the level of establishing the necessary elements of fraud, independent of the breach itself.[47]

Furthermore, Wertzberger has not alleged that he was defrauded out of any investment or loans made to Callide and Canto; his claim arises solely through the contractual provisions in the Callide and Canto Agreements. Even if Wertzberger could point to some evidence tending to suggest fraud or injustice, he would then need to show that this injury was caused by plaintiffs' alleged domination of Callide and Canto. See EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 513 (S.D.N.Y. 2005) (dismissing veil-piercing claim where party failed to show "the use of domination to cause the injury"). Instead, the record is entirely devoid of the type of evidence found to justify veil-piercing in NetJets, such as deliberate mischaracterization of transactions and unfair disregard of creditors. NetJets Aviation, Inc. v. LHC Comm'ns, LLC, 537 F.3d at 183-84.

Given that defendant has failed to carry his burden of demonstrating a basis for disregarding the corporate form and piercing the corporate veil of Callide or Canto, and given that it is undisputed that neither Griggs nor Ford are signatories to the Callide and Canto Agreements in their personal capacity, the Court finds that there are no material issues of fact in dispute as to whether Griggs and Ford should be required to arbitrate Wertzberger's claimed breach of these agreements.

---

[47] The parties raise a number of disputes regarding whether Wertzberger successfully transferred his share in Callide and Canto to Weiner and Rubinsky (see Pls.' 56.1 Stmnt ¶¶ 77-84); or that the withdrawal of Callide and Canto from Camino and Segundo was not required (id. ¶¶ 40, 44, 49, 76); or that no monies were received by Griggs and Ford upon the dissolution of the relationship. (Id. ¶¶ 86(a), (g)). Since these disputes do not bear on the ultimate question of whether Wertzberger has carried his burden of providing sufficient evidence to justify piercing the corporate veil, the Court has not addressed these issues herein.

Accordingly, it is respectfully recommended that plaintiffs' motion for summary judgment be granted and that an Order enter permanently enjoining the California arbitration from proceeding against Griggs and Ford.

F. <u>Declaratory Judgment</u>

Plaintiffs' motion also seeks a declaratory judgment, declaring that plaintiffs are not bound by the arbitration provisions of the Callide and Canto Agreements.  (Pls.' Mem. at 18).

The Federal Declaratory Judgment Act, 28 U.S.C. § 2201, provides:  "In a case of actual controversy within its jurisdiction. . .any court of the United States, upon the filing of an appropriate pleading may declare the rights and other legal relations of any interested party seeking such declaration.  A declaratory judgment is appropriate where there exists a "substantial controversy" between parties who have "adverse legal interests, of sufficient immediacy and reality."  <u>Maryland Cas. Co. v. Pacific Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941).  The Second Circuit has instructed courts to consider: (1) "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether the judgment would finalize the controversy and offer relief from uncertainty."  <u>Duane Reade, Inc. v. St. Paul Fire Marine Ins. Co.</u>, 411 F.3d 384, 389 (2d Cir. 2005) (citing <u>Broadview Chem. Corp. v. Loctite Corp.</u>, 417 F.2d 998, 1001 (2d Cir. 1969), <u>cert. denied</u>, 397 U.S. 1064 (1970)).

In this case, there is an immediate "substantial controversy" in that there is a pending arbitration in California, to which plaintiffs have objected based on the absence of any agreement to arbitrate.  Granting a declaratory judgment will clarify and settle the legal question of whether plaintiffs must appear and defend in that arbitration.  Indeed, declaring once and for all that plaintiffs are not subject to the arbitration provisions of the Callide and Canto Agreements will

resolve this action that has been pending for over eight years and end the uncertainty surrounding the claims raised herein

Accordingly, for the same reasons this Court has recommended granting a permanent injunction enjoining the California arbitration, it is respectfully recommended that the Court grant plaintiffs' motion for a Declaratory Judgment, declaring that the plaintiffs are not bound by the arbitration provisions in the Callide and Canto Agreements.

## CONCLUSION

In light of the foregoing, the Court respectfully recommends that plaintiffs' motion for summary judgment be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      August 10, 2021

                    /s/ Cheryl L. Pollak
                    Cheryl L. Pollak
                    Chief United States Magistrate Judge
                    Eastern District of New York